# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-1257V

| | |
|---|---|
| CHRISTINE M. BOYLE,<br><br>                 Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                 Respondent. | Chief Special Master Corcoran<br><br>Filed: February 26, 2025 |

*Howard Dale Mishkind, Mishkind Kulwicki Law Co., L.P.A., Cleveland, OH*, for Petitioner.

*Katherine Edwards, U.S. Department of Justice, Washington, DC*, for Respondent.

## DECISION AWARDING DAMAGES[1]

      On April 20, 2021, Christine M. Boyle ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") and/or tetanus-diphtheria-acellular pertussis ("Tdap") vaccines that were administered on September 8, 2020. Petition at 1; Am. Petition. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Respondent conceded the case,[3] but the parties could not reconcile their valuations of Petitioner's pain and suffering – for there exists a dispute concerning whether Petitioner's later treatment for cervical radiculopathy was a sequela of her SIRVA. ECF Nos. 36, 38-40, 42-44.[4] They submitted briefing on the issue in early 2024. *See* ECF Nos. 49-51. The matter is now ripe for adjudication.

For the following reasons, I find that Petitioner is entitled to compensation in the form of a lump sum payment of **$119,127.48 (representing $112,500.00 for past pain and suffering, $1,180.00 for past lost wages, and $5,447.48 for past unreimbursable expenses).**

I.   **Relevant Factual Evidence**

Respondent does not dispute that Petitioner received care related to her left-sided SIRVA through August 2, 2021 – or for approximately 11 months following her September 8, 2020 vaccinations. *See*, e.g., Response at 11-12 (citing Ex. 12 at 3). Her relevant treatment included seeking care with her chiropractor[5] within 15 days of vaccination, at which time she experienced a "hard time lifting her arm above her head." Ex. 7 at 78. Petitioner treated her SIRVA using several prescription medications (Voltaren gel, Flexeril, Neurontin/gabapentin), as well as topical anti-inflammatories. Ex. 3 at 12-13, 20; Ex. 4 at 252; Ex. 12 at 19. The medical records show that she rated her shoulder pain ranging from a 1-3/10 (at best after some PT) but 9-10/10 (at worst) (Ex. 6 at 8-49; Ex. 16 at 12, 25, 27, 29), and she displayed varying degrees of diminished range of motion ("ROM") (and impingement signs) causing restrictions with activities of daily living ("ADLs"), such as reaching overhead, sleeping, lifting groceries, performing housework, grooming, and dressing. *See*, e.g., Ex. 3 at 7, 11; Ex. 4 at 229, 252; Ex. 6 at 8-9; Ex. 12 at 18.

---

[3] In Respondent's responsive damages brief, he emphasizes that although Respondent conceded the case, at the time his Rule 4(c) report was filed (in June 2023), he had not been given an opportunity to evaluate whether Petitioner's cervical radiculopathy was the sequelae of her SIRVA – as medical records showing these ongoing cervical symptoms had not been requested or filed until after the submission of Respondent's Rule 4(c) report. Response at 1-2, n.1 (citing Exs. 16-18). Respondent thus maintains that he conceded that Petitioner's *shoulder injury* was caused by the subject flu vaccination, not her cervical radiculopathy – for which she underwent additional treatment. *Id.* at 11 (emphasis in original).

[4] The parties nevertheless agreed on appropriate amounts for past lost wages and unreimbursable medical expenses ($1,180.00 in past lost wages and $5,447.48 in unreimbursable expenses, for a total of $6,627.48). ECF No. 52. This sum will be included in the total damages award.

[5] Petitioner had been seeing a chiropractor for pre-existing back and neck issues for several years prior to her receipt of the subject vaccination. *See* Brief at 4 (citing Ex. 7 at 2-76). She states that she had "no complaints of left shoulder pain or any spine issues" and that such issues "had been under control for more than 3 years and had not been impacting her daily life in any way" prior to the subject vaccinations. *See id.*; *see also* Response at 2-3 (citing Ex. 7 – showing Petitioner received chiropractic care from November 29, 2018 through January 27, 2021 (post vaccination))*.*

More so, a December 2020 MRI revealed a normal rotator cuff, a liner abnormal signal (suggestive of a subchondral fracture without displacement with a periosteal reaction), and mild acromioclavicular ("AC") joint degenerative disease. Ex. 4 at 237-38. She attended 31 total physical therapy ("PT") sessions (16 pre-operative and 15 post-operative) plus a home exercise program ("HEP"). Ex. 6 at 8-40. Finally, Petitioner underwent one arthroscopic shoulder surgery in February 2021 (consisting of a shoulder/biceps tenotomy/hardware removal[6] and debridement of the labrum after removal of the hardware) to treat her diagnosis of impingement syndrome, recurrent subacromial bursitis, hypertrophic type 2 degenerative SLAP tear with bicipital tendinitis, and retained hardware. Ex. 4 at 311-12.

Post-operatively, Petitioner followed up with her orthopedist – including a visit on May 3, 2021, during which she continued to complain of left shoulder pain – but her primary complaint was a "new" pain that was "radiating now from the base of her neck down to her fingertips." Ex. 12 at 16. A cervical-spine ("c-spine") x-ray was abnormal, and the orthopedist's impression was "1. [s]tatus post left shoulder arthroscopy . . . [and] 2. [n]eurogenic nerve pain that is likely from degenerative changes on C-spine identified by x-ray at this visit." *Id.* at 19. The orthopedist recommended ongoing PT and a HEP to address her continued shoulder pain, and for Petitioner to seek care with a spine specialist. *Id.* Petitioner also received a prescription for Neurontin (gabapentin). *Id.*

Beginning on May 20, 2021, Petitioner sought care at c-spine treatment and surgical centers for "neck pain with radiation down to [her] fingers." *See* Ex. 17 at 18-23. Petitioner described her history in relevant part, noting that she received the subject flu vaccine in September 2020 and experienced immediate left upper arm pain for which she was treated with surgery. *Id.* at 18. She also stated she had a stiff neck "for years." *Id.* She was assessed with cervical radicular pain, osteoarthritis ("OA") of the spine with radiculopathy of the cervical region, and neck pain; her Neurontin dose was increased. *Id.* at 22-23.

During a June 17, 2021 initial consultation with a spine specialist, Petitioner stated she had experienced neck pain "since 9/2020" (but also "since 9/8/2021") with her flu vaccine as the "[i]nitiating event." Ex. 18 at 20. She described her neck pain as "sharp, burning, shooting" and that it radiated from the left side of the neck "to" her left upper extremity. *Id.* Petitioner also reported "associated symptoms of numbness and tingling, weakness, [and] hypersensitivity." *Id.* Petitioner noted her history of shoulder surgery "with improvement of shoulder pain" but stated that she still experienced pain in the left

---

[6] The parties agree that Petitioner had a pre-existing left shoulder arthroscopy for a possible SLAP tear in December 2014, but that any pain associated with this injury had fully resolved prior to her 2020 vaccination. *See* Brief at 3-4; *see also* Response at 3 (citing Ex. 4 at 12-15, 72, 75-76, 229; Ex. 7 at 2-76).

3

upper extremity. *Id.* The spine specialist assessed Petitioner with cervicalgia, radiculopathy of the cervical region, neuralgia and neuritis, and causalgia of the left upper limb. *Id.* at 23-24. The specialist's assessment noted that Petitioner had "chronic neck pain most consistent . . . with cervical radiculopathy and cervical spondylosis." *Id.* at 24. Specifically, she "had neck pain for years; however, [her] symptoms became worse in [the left upper extremity] 9/2020 after [her] influenza vaccination." *Id.*

On July 1, 2021, Petitioner complained of "left sided neck pain with brief, intermittent pain *to* the left scapula, upper trap[ezius], and into [the] forearm." Ex. 17 at 11 (emphasis added). She stated that the previously-increased dosage of Neurontin had improved her "arm pain" but she had noticed "more neck aching." *Id.* Petitioner reported that her symptoms "developed after vaccine then worsened after shoulder surgery." *Id.* Her neck pain again received a separate assessment of spinal stenosis of the cervical region, OA of the spine with radiculopathy, and a protruded cervical disc. *Id.* at 15.

Petitioner did not follow up with her orthopedist regarding her left shoulder "biceps tendonitis" until August 2, 2021. Ex. 12 at 3. Petitioner now reported that "[s]ince her previous appointment [in May] she has been under treatment for cervical spine radiculopathy . . . . She has noted significant improvement in her shoulder pain since increasing her dosage of Neurontin[.]" *Id.* Specifically, "[b]oth her [ROM] and pain have continued to improve since her previous visit." *Id.* A physical examination showed "just slightly decreased mobility compared to the right shoulder." *Id.* at 6. The plan was for Petitioner to "continue to slowly increase activity as tolerated" and to continue her "conservative anti-inflammatory treatments in the interim." *Id.* Petitioner's orthopedist noted that Petitioner was to receive her "1st injection into her cervical spine next week for treatment of cervical radiculopathy." *Id.* She was told to return if her symptoms "worsen or fail to improve." *Id.* at 3. This was Petitioner's final follow-up for her left shoulder symptoms.

Petitioner thereafter received ongoing treatment for her cervical radiculopathy symptoms (although the parties dispute whether these concerns were attributable to her SIRVA). On August 12, 2021, Petitioner received an epidural steroid injection ("ESI") in the c-spine, as prescribed by her spine specialist. Ex. 18 at 10. She then returned to her spine specialist for a follow-up on September 2, 2021. *Id.* at 12. Petitioner reported ">90% relief of [her] radicular pain in [her] [left upper extremity]. She has little to no arm pain . . . and also reports very minimal numbness/tingling" but had "persistent axial neck pain" described as "aching and stiff." *Id.* The treater recommended "cervical medial branch blocks." *Id.* at 16, 30. Her neck pain and limited neck ROM remained consistent at a follow-up appointment on November 24, 2021, and she did not complain of ongoing left

4

shoulder symptoms, specifically. *Id.* at 32-36. Rather, she reported "minimal arm pain" but "grip strength concerns." *Id.* at 32.

Likewise, during follow ups with the spine specialist in March and June 2022, Petitioner did not complain of left shoulder symptoms, but experienced (and received treatment for) her "stable" neck symptoms related to her cervical radiculopathy (which eventually also resulted in *right-sided* neck pain). Ex. 18 at 38-49. No other medical records for any treatment after June 2022 have been filed.

Petitioner stated in her first affidavit (authored on April 16, 2021), that "[i]t is likely that [she] will have permanent limitations in [her] [ROM,]" which, according to Petitioner, will "impact [her] in terms of [her] [ADLs] . . . and . . . [her] ability to carry out [her] work as a Children's Ministry Director." Ex. 1 ¶ 9. Such ADLs included driving, sleeping, dressing, showering, grooming, carrying or lifting objects, household chores, physical exercise and intimacy, holding her grandchildren, grocery shopping, and opening heavy doors. *Id.* ¶ 11; Ex. 19 ¶ 20. She also described limitations at work, in that she could not retrieve supplies overhead, speak on stage using her arms, or lead the children in musical worship because she could not demonstrate the dance moves. Ex. 19 ¶ 20. Petitioner's husband submitted a witness declaration corroborating Petitioner's difficulty with these ADLs and the toll it took on her mental and physical health. *See* Ex. 20 at 1-2.

In her supplemental affidavit (authored on December 13, 2023, in conjunction with her brief on damages), Petitioner asserted that her left shoulder surgery and post-operative PT "clearly activated and aggravated [her] pre-existing degenerative changes in [her] neck." Ex. 19 ¶ 19. Petitioner believed this was from being able to only use one arm to perform ADLs and PT as a result of her vaccine-related injury. *Id.* ¶¶ 14-15. She acknowledged that while she is no longer being treated for her ongoing left shoulder pain, she has "residual complications of pain" in her left shoulder described as "tenderness and weakness in the left arm on occasion." *Id.* ¶ 21. She identified examples of when this shoulder pain occurs, noting that she requests the pressure cuff used for blood pressure readings be placed on the opposite arm to avoid pain and that her left arm becomes fatigued more easily than her right when holding babies at work. *Id.* She also stated that, "[p]yschologically[, she] still cannot bear the thought of any needles in [her] left arm," so instead uses the right arm when receiving needles. *Id.* She rated her aching pain (as of December 2023) at a 2/10, that can be "managed with rest or the occasional Tylenol." *Id.* ¶ 22. In Petitioner's husband's witness declaration (authored on December 11, 2023), he opined that the stress of recovering from surgery and PT "aggravated [Petitioner's] neck" and made her neck issues "more painful than she ever experienced prior to the vaccination." Ex. 20 at 1-2. No additional affidavit evidence has been submitted.

## II.   The Parties' Arguments

Petitioner seeks a past pain and suffering award of $135,000.00, and $15,000.00 for future pain and suffering. Brief at 2-3, 16. She notes that she sought care promptly after vaccination, had no gaps in treatment, attended 31 total PT sessions (both pre- and post-operative), and underwent surgery. *Id.* at 12. But that surgery failed to fully resolve her symptoms, and was "more involved then [sic] if she had no prior surgical care" in 2014. *Id.*; Reply at 3. More so, Petitioner argues that following her surgery her shoulder pain was "severe" and that this pain "aggravated and activated symptoms in the left cervical region" that "had been asymptomatic prior to her vaccination and surgical care" and caused her to undergo additional treatment. Brief at 12, 15; Reply at 4, 6. And, Petitioner relies on the limitations in her ADLs, primarily with her relationship with her husband and grandchildren, performing "clerical tasks," and "using her arm and strain on her neck due to repetitive reaching." Brief at 15-16; Reply at 4.

In support of her request for future pain and suffering, Petitioner argues that she "continues to have pain rated at a 2/10 that she manages without treatment." Brief at 16. She also states, however, that if it is determined that her ongoing cervical symptoms were not substantially related to her SIRVA, "the court would be justified in not awarding any amount for future pain and suffering." Reply at 7. For comparable cases, Petitioner offers *Rafferty, Wilson, Blanco, Kelley, Nute,* and *McKay*[7] - decisions featuring past pain and suffering awards ranging from $120,000.00 to $135,000.00. Brief at 13-15; Reply at 4.

In proffering a lower award of $87,500.00 for past pain and suffering, Respondent asserts that Petitioner's injury was "abbreviated, albeit aggressive." Response at 15. Specifically, her entire treatment course was completed in "under [11] months" and was comprised of three prescription medications (Voltaren gel, Flexeril, and Neurontin), two rounds of PT, and one shoulder arthroscopy and debridement. *Id.* In further support of his position that Petitioner's pain was moderate and time-limited, Respondent emphasizes that Petitioner rated her pain most often at a 4-5/10, she reported "significant

---

[7] Citing *Rafferty v. Sec'y of Health & Hum. Servs.*, No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020) (awarding $127,500.00 for past pain and suffering); *Wilson v. Sec'y of Health & Hum. Servs.,* No. 19-35V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021) (awarding $130,000.00 for actual pain and suffering); *Blanco v. Sec'y of Health & Hum. Servs.,* No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020) (awarding $135,000.00 in actual pain and suffering); *Kelley v. Sec'y of Health & Hum. Servs.,* No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 for actual pain and suffering); *Nute v. Sec'y of Health & Hum. Servs.*, No. 18-140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for past pain and suffering); and *McKay v. Sec'y of Health & Hum. Servs.,* No. 21-71V, 2023 WL 9231565 (Fed. Cl. Spec. Mstr. Dec. 11, 2023) (awarding $127,500.00 in actual pain and suffering).

improvement" at the conclusion of her treatment course, and she did not seek shoulder-related care after August 2, 2021. *Id.* at 12, 15-16 (citing Ex. 12 at 3).

Respondent also stresses that Petitioner has not alleged a significant aggravation of her pre-existing neck injury, and thus opposes her request for any future pain and suffering. Response at 11, n.8. Respondent specifically contests that Petitioner's ongoing cervical radiculopathy symptoms are the sequelae of her SIRVA, as her contemporaneous medical records document lingering symptoms from her cervical radiculopathy, not her SIRVA – and the only evidence of ongoing SIRVA symptoms is her own affidavit. *Id.* at 12 (citing Ex. 12 at 16; Ex. 17 at 11, 18; Ex. 18 at 5, 12, 32, 38, 44). He asserts that even if the court were to consider Petitioner's ongoing cervical pain as sequela of her SIRVA, Petitioner's pain is not "severe enough to warrant awarding future pain and suffering damages[,]" as she has failed to show an indicia of permanency in her injury. *Id.* at 13-14 (citing Ex. 18 at 12, 32, 28, 44; Ex. 19 at 6). Respondent offers *Hunt* and *Shelton*[8] as more appropriate comparable cases. *Id.* at 17-18.

## III.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award

---

[8] *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for past pain and suffering); *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021) (awarding $95,000.00).

for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

### IV.  Prior SIRVA Compensation Within SPU[9]

#### A.  Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU

---

[9] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[10] In only 270 of these cases, however, was the amount of damages determined by a special master in a reasoned decision.[11] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[12]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[13] Agreement** |
|---|---|---|---|---|
| **Total Cases** | 270 | 2,206 | 30 | 1,891 |
| **Lowest** | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| **1st Quartile** | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| **Median** | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |

---

[10] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[11] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[12] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[13] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[14] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[15]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several

---

[14] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[15] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## V. Appropriate Compensation for Petitioner's Actual Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, affidavits, witness declaration, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

The main dispute in this case centers around the *duration* of Petitioner's vaccine-related shoulder injury – and, in turn, what (if any) ongoing cervical symptoms and treatments can reasonably be attributed to the SIRVA. Petitioner argues her SIRVA course and sequelae ran for nearly two years (through her June 2022 treatment for cervical radiculopathy), while Respondent contends it resolved within one year (by August 2021). The medical record preponderantly supports Respondent's position: that Petitioner's treatment course for vaccine-related left shoulder pain and ongoing SIRVA symptoms continued for approximately 11 months (or through August 2021), with her subsequent treatment unrelated.

Several aspects of the overall record support this determination. For example, the filed medical evidence shows that Petitioner's SIRVA had largely resolved following her treatment with arthroscopic surgery and post-operative PT. Indeed, during her last visit for shoulder symptoms with her orthopedist on August 2, 2021, Petitioner reported "significant improvement" in her shoulder symptoms, and, upon examination, her left shoulder's ROM was only "slightly" decreased compared to her right shoulder; her examination was otherwise unremarkable. Ex. 12 at 3. Consequently, Petitioner was told to resume activities "as tolerated" and to return only if her shoulder pain did not improve or worsened. *Id.* at 3-6. Petitioner then did not seek *any* additional shoulder treatment with her orthopedist or otherwise, nor did she complain of shoulder-related symptoms, specifically. It is persuasive that Petitioner did not return to care following this date. All of the above undermines Petitioner's argument that her SIRVA symptoms continued past August 2021.

Additionally, the medical records (starting with her May 2021 care) clearly establish that Petitioner experienced other comorbid but distinctive cervical issues (eventually diagnosed and treated as cervical radiculopathy) that were unrelated to and inconsistent with her original SIRVA. *See,* e.g., Ex. 12 at 16-19 (a May 3, 2021 report of a "new" primary pain radiating *from* her neck *to* the vaccinated shoulder/arm; and that the "[n]eurogenic nerve pain [was] likely from degenerative changes on C-spine identified by x-ray."); Ex. 17 at 18-22 (a May 20, 2021 complaint of "neck pain with radiation down into [her] fingers," resulting in diagnoses of cervical radicular pain, OA of the spine with radiculopathy of the cervical region, and neck pain); Ex. 18 at 20-24 (a June 17, 2021 report of neck pain that radiated "to" her left upper extremity with numbness, tingling, weakness, and hypersensitivity, leading her treater to assess her with cervicalgia, radiculopathy of the cervical region, neuralgia and neuritis, and causalgia of the left upper limb); Ex. 17 at 11, 15 (a July 1, 2021 report of "left sided neck pain with brief, intermittent pain to the left scapula, upper trap[ezius], and into [the] forearm," leading to diagnoses of spinal stenosis of the cervical region, OA of the spine with radiculopathy, and a protruded cervical disc); Ex. 18 at 10 (receipt of an ESI on August 2, 2021, specifically to treat her cervical symptoms). These ongoing symptoms and related diagnoses are thus inconsistent with SIRVA-related pain.

Finally, while Petitioner conveyed her own personal belief to treaters that her cervical pain had been aggravated or caused by her SIRVA and related care, she has tellingly not alleged in this matter that her *pre-existing* neck symptoms were significantly aggravated by the subject vaccination. In fact, the filed record would not support that argument. Indeed, the only support in the record for this conclusion is Petitioner's word, unsupported by medical record or opinion. *See,* e.g., Ex. 17 at 18 (reporting on May 20, 2021, that her post-operative PT related to her SIRVA had increased her neck pain, which had previously been under control with chiropractic care); Ex. 18 at 20 (a June 17, 2021 complaint of neck pain "since 9/2020" with her flu vaccine as the "[i]nitiating event."); Ex. 17 at 11 (a July 1, 2021 report of cervical sided neck pain that "developed after vaccine then worsened after shoulder surgery"); Ex. 19 ¶¶ 14-15, 19 (attesting in her December 2023 supplemental affidavit that her cervical issues were "aggravated and made symptomatic due to [her] injury to [her] left arm as a result of [her] vaccination," plus subsequent surgery and PT). Despite Petitioner's statements to treaters (and in her affidavit), her treaters felt that her cervical issues were a result of "degenerative changes" seen on a c-spine x-ray in May 2021. Ex. 12 at 19.

The filed record in this case nevertheless establishes that Petitioner suffered a moderate-to-severe SIRVA overall – with an aggressive treatment course over a fairly short time. Particularly probative is evidence demonstrating that Petitioner sought treatment for left shoulder pain within 15 days of her vaccination, underwent subsequent

treatment with several prescription medications, x-rays and one MRI, participation in pre- and post- operative rounds of PT for a total of 31 sessions (plus an HEP), and one arthroscopic surgery (which was significant in that it included removal of hardware from a pre-existing but unrelated shoulder injury) – resulting in some lingering stiffness and effects. Additionally, Petitioner's medical records contain descriptions of her pain on a ten-point scale ranging from a 1-9/10 – with the bulk of her pain being at the start of treatment with PT and again post-surgery. *See* Ex. 6 at 8; *see also* Ex. 16 at 12. She also experienced diminished ROM soon after vaccination, with some slight lingering limitations at the conclusion of her vaccine-injury related care in August 2021. Ex. 3 at 7, 11; Ex. 4 at 229, 252; Ex. 6 at 9; Ex. 12 at 6.

Turning to the parties' cited comparable cases, Petitioner's reliance on *Blanco, Wilson,* and *McKay* is somewhat misplaced. Petitioner's vaccine-related care was not as extensive as the petitioners in those of her cited cases. *Blanco v. Sec'y of Health & Hum. Servs.,* No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020); *Wilson v. Sec'y of Health & Hum. Servs.,* No. 19-35V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021); *McKay v. Sec'y of Health & Hum. Servs.,* No. 21-71V, 2023 WL 9231565 (Fed. Cl. Spec. Mstr. Dec. 11, 2023). The petitioner in *Blanco*, for example – the only of Petitioner's cited cases wherein her requested amount for actual pain and suffering was awarded, treated for a total of approximately two years, underwent three MRIs, received four cortisone injections, and treated with 43 PT sessions. *See* 2020 WL 4523473. Likewise, the petitioners in *Wilson* and *McKay* treated for considerably longer than Petitioner (31 and 32 months, respectively, versus Petitioner's 11-month course) – thus properly entitling those petitioners to higher awards than Petitioner here. *See* 2021 WL 1530731; *see also* 2023 WL 9231565. Although *Wilson* had a significant one-year gap in SIRVA-related care, whereas Petitioner in this case treated her shoulder injury consistently for her 11-month course, the *Wilson* petitioner's overall lengthy treatment compared to Petitioner's time-limited course, makes a lower award appropriate in Petitioner's case. *See* 2021 WL 1530731.

Additionally, while Petitioner's treatment duration and course is roughly equivalent to the *Rafferty* and *Nute* petitioners, those individuals were justified in receiving a higher award than Petitioner here because they presented evidence establishing the significant hardship imposed on their personal circumstances as a result of their vaccine injury. *Rafferty v. Sec'y of Health & Hum. Servs.*, No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020); *Nute v. Sec'y of Health & Hum. Servs.*, No. 18-140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019). For instance, the *Rafferty* petitioner was a mother and caretaker of young twin sons, one of whom who had recently been diagnosed with autism. *See* 2020 WL 3495956. It was thus conceivable that she would have experienced difficulties in caring for the children throughout the day as a result of

her injury. *See id.* I also found that *Rafferty's* inability to explain her difficulties to her young sons compounded her pain and suffering, entitling her to a higher award. *Id.* Likewise, in *Nute*, I considered the petitioner's profession as an emergency room nurse and noted her inability to perform certain physical work-related tasks as a result of her vaccine-injury. *See* 2019 WL 6125008. While I empathize with Petitioner's difficulties performing ADLs, including with trouble holding children and demonstrating musical worship dance moves in her occupation as a Children's Ministry Director, such difficulties are not comparable to the extraordinary personal and occupational hardships faced by the *Rafferty* and *Nute* petitioners which justified a higher award.

Respondent's offered comparable cases of *Hunt* and *Shelton* are, however, also largely unhelpful in calculating pain and suffering. As has previously been noted, these two decisions stand as "outlier determinations, and rare instances of deviating from the above $100,000.00 'norm' for SIRVA cases involving surgery." *Laurette v. Sec'y of Health & Hum. Servs.*, No. 19-1047V, 2024 WL 1741611, at *5 (Fed. Cl. Spec. Mstr. Mar. 25, 2024); *see also,* e.g., *Olson v. Sec'y of Health & Hum. Servs.*, No. 21-0408V, 2024 WL 1521634, at *4 (Fed. Cl. Spec. Mstr. Mar. 4, 2024) (characterizing the cases as "outliers in the context of SIRVA damages"); *Gao v. Sec'y of Health & Hum. Servs.*, No. 21-1884V, 2023 WL 6182455, at *3 (Fed. Cl. Spec. Mstr. Aug. 18, 2023) (emphasizing that *Hunt* and *Shelton* were "*sui generis* instances of a sub-six figure award in SIRVA cases featuring surgery"). It is instead the case that "the policy goals of the Vaccine Program are best served if outcomes in common cases (like SIRVA vaccine injury claims) are predictable and/or subject to some uniformity – and it has been my determination that surgery cases reasonably present a degree of suffering justifying a six-figure award. (Otherwise, adjustments are always considered and made to account for the facts of each case, and in some instances even SIRVA surgery cases result in lower pain and suffering awards)." *Richardson v. Sec'y of Health & Hum. Servs.*, No. 20-0674V, 2023 WL 6180813, at *8 (Fed. Cl. Spec. Mstr. Aug. 16, 2023).

Petitioner's SIRVA was not so exceptionally moderate to warrant a departure below the six-figure norm for injuries leading to surgery (and certainly not even lower such that it might fit Respondent's proposal of $87,500.00). In fact, the characteristics of Petitioner's injury most factually mirror those in *Kelley v. Sec'y of Health & Hum. Servs.*, No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 in past pain and suffering). That petitioner suffered a moderate-to-severe SIRVA for approximately 13 months, had significant findings on MRI (an infraspinatus tear, supraspinatus tendinosis, and bursitis), and received fairly equivalent (albeit slightly more) care than Petitioner, including one arthroscopic surgery (consisting of a subacromial decompression, distal clavicle excision, biceps tenotomy, and removal of the AC joint – plus the discovery and removal of a large subacromial spur and hypertrophic

bursa), one cortisone injection, and pre- and post-operative PT, totaling 45 sessions. *See* 2019 WL 5555648. The *Kelley* petitioner, like Petitioner here, also demonstrated limitations in ADLs, including carrying her granddaughter. *See id.* As Petitioner received objectively lesser treatment than *Kelley* – without receiving any cortisone injections for her shoulder pain and attending 14 lesser PT sessions – she ought to be awarded a slightly lower sum.

Based on all of the circumstances and evidence submitted, I find that Petitioner's past pain and suffering warrants an award of **$112,500.00.**

## VI.     Appropriate Compensation for Future Pain and Suffering

I do not include any component of damages for future pain and suffering. Such an award is appropriate "only for cases where a strong showing is made that the claimant has suffered a permanent disability, or there are other extenuating circumstances that justify inclusion of a future component." *Accetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021 WL 1718202, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021). Special masters have previously declined to award a future pain and suffering award in the absence of substantial indicia of permanency. *See,* e.g., *Reed v. Sec'y of Health & Hum. Servs.,* No. 16-1670V, 2019 WL 1222925, at *17 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (noting there should be "adequate medical evidence demonstrating the likelihood that petitioner's shoulder injury, more likely than not, will extend well into the future and . . . indicating that [a] shoulder injury is permanent").

Petitioner has not established that the sequela of her SIRVA continued beyond August 2021 sufficient to justify a future pain and suffering component. Rather (and as is often emphasized in Program damages determinations), lingering SIRVA symptoms are not the same as permanent deficits, even if the claimant demonstrably continues to experience some post-vaccination and treatment issues. Without specific medical records documenting a permanent injury, or one that is intrusive and will continue into the indefinite future, a future pain and suffering award is not warranted. Petitioner here admitted that she is no longer seeking treatment for her shoulder symptoms but instead experiences "residual complications of pain . . . on occasion," rated at a 2/10 (at most), and the symptoms are manageable with rest or Tylenol. Ex. 19 ¶¶ 21-22. She even identified limited examples of when this pain occurs (with blood pressure readings, holding children, and that she receives needles in the opposite arm). *See id.* These complaints do not equate to ongoing and permanent deficits sufficient to justify a future pain and suffering award.

## Conclusion

For all the reasons discussed above and based on consideration of the entire record, **Petitioner is entitled to damages in the form of a lump sum payment of $119,127.48 (representing $112,500.00 for past pain and suffering, $1,180.00 for past lost wages, and $5,447.48 for past unreimbursable expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement.**

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[16]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.